# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> ALTEDIAS MAURICE CAMPBELL, <br><br> Defendant. | No. 01-CR-2002-CJW-MAR <br><br><br> **MEMORANDUM OPINION AND ORDER** |

## I. INTRODUCTION

This matter is before the Court on defendant's motion for compassionate release and for relief under Section 404 of the First Step Act ("FSA") filed on June 29, 2020. (Docs. 289 & 290). On July 6, 2020, the government timely filed a resistance. (Doc. 291). On July 13, 2020, defendant timely filed a reply. (Doc. 292). On October 23, 2020, defendant filed a supplement to his motion. (Doc. 293). For the following reasons, the Court **denies** defendant's motion.

The Court will first address whether compassionate release is warranted before considering relief under the FSA.

## II. RELEVANT BACKGROUND

### A. Procedural History

On February 10, 2000, an officer observed defendant sell cocaine from his car to S.A. within 1,000 feet of an elementary school.[1] (Doc. 200, at 5). S.A. was arrested and, when asked who sold him the cocaine, identified "Gushie's brother." (*Id.*). One of the officers recognized Gushie as a nickname for defendant's brother. (*Id.*). Officers

---

[1] Defendant notes that S.A. "was working for the police" (Doc. 290, at 20), but the presentence investigation report ("PSR") appears to indicate that officers were conducting an undercover buy from S.A. (Doc. 200, at 5).

located defendant's car outside a nearby residence on Bratnober Street. (*Id.*). After checking the license plate on the vehicle, officers determined the vehicle was registered to defendant at a residence on Bratnober Street. (*Id.*). Shortly thereafter, defendant left his residence and drove away in his vehicle. (*Id.*). Officers stopped the vehicle and defendant consented to a search. (*Id.*). Officers did not recover any drugs, cash, or other contraband from the vehicle. (*Id.*). On September 26, 2000, officers stopped defendant's vehicle for failure to use a turn signal. (*Id.*, at 6). Officers detected the odor of alcohol and subjected defendant to sobriety tests, which he failed. (*Id.*). Defendant was arrested after the breathalyzer showed his blood alcohol content was .255. (*Id.*). Upon searching defendant's vehicle, officers recovered two baggies of cocaine under the driver's seat. (*Id.*). A total of $174, consisting of $10 and $20 bills, was recovered from defendant's person. (*Id.*). In total, this offense involved two grams of cocaine. (*Id.*).

On January 12, 2001, a grand jury issued an Indictment charging defendant with one count of possession with intent to distribute cocaine in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).[2] (Doc. 1); *see also* (Doc. 200, at 3). On February 1, 2001, defendant pled not guilty and was detained. (Doc. 3). On May 2, 2001, defendant was found guilty after a jury trial. (Docs. 51 & 55). On May 9, 2001, defendant moved for, among other things, a new trial. (Doc. 59). On July 27, 2001, the Court sentenced defendant. (Doc. 79).[3] The Court found defendant did not qualify as a career offender because his prior burglary conviction was not a crime of violence. (Doc. 200, at 3). Thus, defendant was in criminal history category VI with a total offense level of 22, yielding an advisory guideline range of imprisonment of 84 to 105 months. (*Id.*, at 3–4). The Court sentenced defendant to 104 months' imprisonment followed by four years on supervised release. (Doc. 80). That same day, the Court

---

[2] Documents entered prior to June 2003 are visible on the online docket but not accessible.

[3] The minute entry shows defendant was originally sentenced on July 27, 2001 (Doc. 79), but his PSR states his original sentencing occurred on July 1, 2001 (Doc. 200, at 3). The exact date is immaterial here.

denied defendant's motion for a new trial. (Doc. 78). On August 2, 2001, defendant appealed his conviction and sentence to the Eighth Circuit Court of Appeals. (Doc. 81).

On June 5, 2002, defendant again moved for a new trial, this time based on newly discovered evidence. (Doc. 90). After holding a hearing on defendant's motion on August 26, 2002 (Doc. 97), the Court granted the motion on December 23, 2002 (Doc. 99). On January 3, 2003, the government appealed the Court's grant of a new trial. (Doc. 100). On February 28, 2003, the Eighth Circuit Court of Appeals dismissed the government's appeal. (Doc. 106).

On March 24, 2003, the Eighth Circuit Court of Appeals remanded this case back to the district court for further proceedings. (Doc. 111).[4] That same day, a grand jury issued a Superseding Indictment charging defendant with the same offense as well as distribution of cocaine within 1,000 feet of a school in violation of Sections 841(a)(1), 841(b)(1)(C), and 860. (Doc. 108); *see also* (Doc. 200, at 4). On April 17, 2003, defendant pled not guilty and was detained. (Doc. 113). On June 6, 2003, defendant was found guilty of both counts charged in the Superseding Indictment after a five-day jury trial. (Docs. 167 & 173).

On December 23, 2003, the Court again sentenced defendant. (Doc. 211). Defendant was in criminal history category VI with a total offense level of 34 after receiving a career offender enhancement, yielding an advisory guideline range of 262 to 327 months imprisonment on both counts followed by effectively six years to life on supervised release on both counts. (Doc. 200, at 43–44). The Court sentenced defendant to 300 months' imprisonment on Count 1 and 240 months' imprisonment on Count 2 to be served concurrently and six years' supervised release on Count 1 and three years' supervised release on Count 2 to be served concurrently. (Doc. 212). On December 29,

---

[4] The PSR states this case was remanded on March 6, 2003 (Doc. 200, at 4). Again, the precise date is immaterial.

2003, defendant timely appealed his conviction and sentence.  (Doc. 213).  On July 28, 2005, the Eighth Circuit Court of Appeals affirmed.  (Doc. 226).

On February 20, 2008, defendant filed a pro se motion to reduce his sentence. (Doc. 231). On November 12, 2008, the Court found a reduction was not warranted. (Doc. 233). On December 17, 2008, defendant appealed the Court's ruling. (Doc. 235). On January 8, 2009, the Eighth Circuit Court of Appeals dismissed the appeal due to lack of jurisdiction. (Doc. 239). On February 23, 2009, defendant filed another pro se motion to reduce his sentence. (Doc. 241). On February 24, 2009, the Court denied defendant's motion. (Doc. 242). On March 23, 2009, defendant moved for the Court to reconsider its prior Order and moved for an evidentiary hearing. (Doc. 243). On March 24, 2009, the Court denied both motions. (Doc. 245). On April 14, 2009, defendant appealed the Court's ruling. (Doc. 248). On May 8, 2009, the Eighth Circuit Court of Appeals affirmed. (Doc. 253).

On October 4, 2011, defendant filed a pro se motion to reduce his sentence. (Doc. 256). That same day, the Court denied the motion. (Doc. 257). On November 28, 2011, defendant appealed the Court's ruling. (Doc. 258). On December 7, 2011, the Eighth Circuit Court of Appeals dismissed the appeal as untimely. (Doc. 263). On January 25, 2013, defendant filed a pro se motion to set aside the Judgment. (Doc. 267). On January 28, 2013, the Court denied the motion. (Doc. 268). On February 11, 2013, defendant filed a pro se motion to correct his sentence. (Doc. 269). On February 12, 2013, the Court denied the motion. (Doc. 270). On August 19, 2013, defendant filed a pro se motion to be resentenced. (Doc. 273). On August 20, 2013, the Court denied the motion. (Doc. 274). On November 20, 2014, defendant filed a pro se motion to reduce his sentence. (Doc. 275). On June 19, 2015, the Court denied the motion. (Doc. 276).

On February 14, 2019, defendant filed a pro se motion to reduce his sentence. (Doc. 279). On April 6, 2020, defendant filed another pro se motion to reduce his sentence. (Doc. 280). On April 13, 2020, the Court denied defendant's second motion. (Doc. 281). On June 8, 2020, defendant filed a third pro se motion to reduce his sentence.

4

(Doc. 284). On June 15, 2020, the Court appointed defendant counsel. (Doc. 285). On June 29, 2020, defendant filed his amended motion now before the Court. (Doc. 289). Defendant, now nearly 47 years old, is currently incarcerated at Fairton FCI with a projected release date of June 25, 2022.[5]

### B. Defendant's Personal History at Sentencing

On September 25, 2003, the United States Probation Office ("USPO") filed defendant's PSR for his second sentencing. (Doc. 200). Defendant was, at that time, 29 years old and residing in Waterloo, Iowa, where he was also born. (*Id.*, at 36). Defendant was raised by his mother in an "extremely dysfunctional home" until age 7, at which time he was removed and placed in various foster homes. (*Id.*). Defendant maintained a "good relationship" with his father even though his father was incarcerated for sexually abusing defendant's sisters. (*Id.*). His home life was described as impoverished, abusive, unstable, and dangerous. Defendant had many siblings, some of whom were incarcerated and some of whom had died due to medical issues.[6] Defendant completed the requirements for a high school diploma at a training school and earned a vocational training certificate. (*Id.*, at 42). He was employed at a club for a year prior to his arrest but had minimal work history beyond that. (*Id.*, at 43–44). Defendant had four purported children across three relationships, although he disputed the paternity of two of them. (*Id.*, at 37). Defendant was also married but requested a divorce. (*Id.*).

Defendant was in "good health" and "denied any history of significant health problems." (*Id.*, at 38). He had been hospitalized a few times as a child for various accidents and once in 2000 for a gunshot wound to his heel after he was shot by his former girlfriend. (*Id.*). In 1983, a doctor found defendant had attention deficit disorder. (*Id.*). Testing suggested he had "organic brain damage," which explained his impulsive,

---

[5] *Find an Inmate*, BOP, https://www.bop.gov/inmateloc/.

[6] This information is based on page 37 of the PSR, which is omitted from the online docket filing. *See* (Doc. 200, at 36–37). The USPO recovered defendant's full PSR from its archive.

restless, and "extremely hostile" behavior. (*Id.*). In 1986, an evaluation noted his behavioral issues were attributable to home and environmental factors. (*Id.*, at 38–39). Defendant was diagnosed with atypical conduct disorder and adjustment disorder with mixed emotional features, characterized by depressive and anxious symptoms. (*Id.*, at 39). Defendant was, at various times, sexually abused by a priest, a minister, and his mother's boyfriend. (*Id.*, at 39–40). He was later diagnosed with depressive disorder, anxiety disorder, obsessive compulsive disorder, and antisocial personality traits. Later tests performed while defendant was incarcerated in 1994 and 1995 found he was cooperative, positive, warm, easygoing, energetic, contented, and had "a strong sense of self worth." (*Id.*, at 40–41). Tests inconsistently found defendant had normal to low intellectual capacity. (*Id.*, at 38–41). He reported normal use of alcohol. (*Id.*, at 41). Defendant had little interest in drugs until discovering he could mix marijuana and cocaine in recent years, at which point he began using the combination regularly. (*Id.*).

Defendant had an extensive and violent criminal history. From ages 8 to 15, he was convicted various low-level thefts and burglaries as well as a robbery. (*Id.*, at 12–16). At age 16, defendant was convicted of burglary, theft, assault, and disorderly conduct for, among other things, entering multiple residences and striking some of their occupants. (*Id.*, at 16–17). At age 18, he was convicted of aggravated criminal mischief and assault after he beat a man with a tailpipe, was arrested and presumably released, and then threw a sizable rock at that same man just over an hour later. (*Id.*, at 18). Defendant was convicted of criminal mischief again a few months later for destroying a clock and a door when he became upset during a basketball game. (*Id.*, at 20). At age 19, defendant was convicted of burglary, assault, and criminal mischief after destroying the exterior of his fiancée's car and attempting to pull her out of the broken passenger-side window. (*Id.*, at 21–22). A few months later, he was convicted of assaulting another woman. (*Id.*, at 25). A month after that, defendant was convicted of assaulting his girlfriend after he pulled her to the ground by her hair and threatened her and her children. (*Id.*, at 26). Officers had to physically restrain defendant and use pepper spray

6

to end his assault. (*Id.*). A few months later, defendant was convicted of assault causing bodily injury after defendant and others destroyed a car with concrete blocks and crow bars, attacked a man causing injuries to his face, and hit a woman in the head with a piece of concrete. (*Id.*, at 27–28). Still at the age of 19, he was convicted of conspiracy to commit robbery after he assisted his brother in robbing an elderly man of $36 at gunpoint. (*Id.*, at 28). For this offense, defendant was sentenced to 10 years' imprisonment, but was released after serving five and a half years. (*Id.*). From ages 18 to 19, his probation was revoked nearly every time he was on it for a litany of violations and he was also convicted of driving on a suspended license eight times, interference with official acts, open container, and using alcohol underage. (*Id.*, at 21–28).

Following his release from prison, from ages 24 to 26, defendant was convicted of absence from a required place after signing out of a residential reentry center and failing to return, interference with official acts after running from officers, consuming alcohol in a public place, and disorderly conduct twice. (*Id.*, at 28–29). Defendant was also convicted of violating a no contact order which appeared to involve violence or at least the threat of violence against a woman. (*Id.*, at 30–31).

### III. COMPASSIONATE RELEASE

#### A. Applicable Law

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons ("BOP")] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Although some courts disagree, this Court holds that defendants are not required to administratively appeal a warden's denial and may satisfy Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion for compassionate release

7

in the courts. *United States v. Burnside*, 467 F. Supp. 3d 659, 667 (N.D. Iowa 2020) (compiling cases).

The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

United States Sentencing Guidelines ("USSG") Section 1B1.13 defines "extraordinary and compelling reasons" as used in Section 3582(c)(1)(A)(i). Section 1B1.13 provides that such reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physical or mental deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; or (5) is experiencing some other extraordinary and compelling reason as determined by the BOP. Although some courts disagree, this Court holds that Section 1B1.13 is not binding because it predates the First Step Act of 2018's amendments to Section 3582(c)(1)(A)

8

which enabled defendants to bring motions for compassionate release on their own behalf. *United States v. Crandall*, No. 89-CR-21-CJW-MAR, 2020 WL 7080309, at *5 (N.D. Iowa Dec. 3, 2020). The Court recognizes, however, that Section 1B1.13 should still be considered a helpful guidepost in determining whether extraordinary and compelling reasons exist to release a defendant. *Id*.

### B. Analysis

#### 1. *Exhaustion of Administrative Remedies*

In early April 2020, defendant states that he submitted a request for release to the warden of his facility but never received a response. (Doc. 290, at 7–8). Although defendant's request itself has not been obtained, there is a May 20, 2020 email from defendant in the record which requests an update on the status of his prior request. (Doc. 291–2). This email supports the conclusion that some earlier request was made. The government does not argue otherwise. (Doc. 291, at 9–10). Because 30 days have lapsed since defendant submitted his request to the warden, the Court finds he has fulfilled the exhaustion requirement of Section 3582(c)(1)(A). *See Burnside*, 467 F. Supp. 3d at 667.

#### 2. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his medical conditions put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 290, at 9–16). Defendant cites his obesity, asthma, hypertension, hyperlipidemia, and hyperthyroidism. (*Id.*, at 12). He tested positive for COVID-19 in June 2020 but was asymptomatic. (*Id.*, at 13). Fairton FCI currently has 89 active cases of COVID-19 among its inmates and 13 among its staff, with 181 inmates and 17 staff recorded as recovered.[7] No inmates or staff have died of COVID-19 at the facility. *Id*.

The presence of COVID-19 at a defendant's facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the

---

[7] *COVID-19,* BOP, https://www.bop.gov/coronavirus/.

defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 467 F. Supp. 3d at 668 (compiling cases). The Centers for Disease Control and Prevention ("CDC") recognizes that persons with a body mass index ("BMI") in excess of 30 are at increased risk during the pandemic.[8] The CDC notes that moderate to severe asthma and hypertension may increase a person's risk. *Id.* Hyperlipidemia and hyperthyroidism are not noted by the CDC as being relevant to COVID-19. *Id.* Further, the CDC holds that a person's risk increases with their age.[9] The CDC notes that eight out of ten deaths related to COVID-19 in the United States have been in persons over age 65 and that persons over 85 are at the greatest risk. *Id.*

Defendant is nearly 47 years old. (Doc. 200, at 2). Thus, his age-related risk is noted but not cause for particular concern given that he is not in or near being in a high-risk age group.

Defendant meets the CDC's risk category for obese persons with a BMI in excess of 30. His most recent BMI taken on February 5, 2020, was 35. (Doc. 290–1, at 53). His BMI has been in excess of 30 since as early as 2015. (*Id.*). Thus, the Court considers this health condition to be a relevant risk factor in its analysis.

Defendant also meets two of the CDC's potential risk categories due to his asthma and hypertension. Defendant is diagnosed with mild, intermittent asthma, which he reports is triggered by exercise and dust. (*Id.*, at 14, 65). He is prescribed an inhaler to prevent or relieve an asthma attack, not for daily use. (*Id.*, at 13). Defendant reported some shortness of breath at night related to his asthma in February 2020. (*Id.*, at 14). He has denied having any shortness of breath on multiple other occasions in 2020, as recently as June 2020. (*Id.*, at 6, 9, 21, 38–41). In April 2020, he expressed concern about his asthma in relation to COVID-19. (*Id.*, at 9). His respiratory rate is consistently

---

[8] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (Dec. 29, 2020).

[9] *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (Dec. 13, 2020).

10

normal or slightly elevated, his breathing in within normal limits, his lungs sound clear, and his air flow is within normal range. (*Id.*, at 2–3, 42–43). Defendant receives medication for his hypertension. (*Id.*, at 7). His chief complaint to medical staff is often his hypertension. (*Id.*, at 2, 21). His blood pressure readings from August 2019 to May 2020 show he is consistently in hypertension stages 1 and 2.[10] (*Id.*, at 6, 8, 10, 14, 19, 25, 34, 42, 70, 74, 76). Thus, the Court affords defendant's asthma minimal weight in its analysis due to its moderate nature and affords his hypertension significant weight due its consistency and severity.

Defendant's other health conditions, although notable, are not considered actual or potential health conditions relevant to COVID-19. Even so, defendant's hyperthyroidism is not particularly serious. Although he is diagnosed with this condition, he reported no symptoms despite not taking his medication. (*Id.*, at 14). His hormones are reported as being only "borderline elevated" and he was noted as "asymptomatic." (*Id.*, at 17). Despite his diagnosis of hyperlipidemia, he has not been recommended for statin therapy and, instead, has only been advised of lifestyle modifications to lower his cholesterol. (*Id.*, at 17). Defendant also noted on multiple occasions that he was not taking his hyperlipidemia medication. (*Id.*, at 17, 36). Thus, these conditions appear to be relatively minor and the Court affords them little weight.

In sum, defendant's only condition which is known to increase his risk to COVID-19 is his obesity, which appears to be well-managed. Nothing in the record indicates defendant is in deteriorating or debilitated health due to his obesity, or that it even hinders him. Indeed, he is a Care Level 2 inmate who requires chronic care but is not inhibited

---

[10] Blood pressure of less than 120/80 mm Hg is considered within normal range. Elevated blood pressure occurs when readings consistently show 120–129 systolic and less than 80 diastolic. Hypertension Stage 1 occurs when readings consistently show 130–139 systolic or 80–89 diastolic. Hypertension Stage 2 occurs when readings consistently show 140/99 or higher. Hypertensive crisis, which requires immediate medical attention, is when readings suddenly exceed 180/120. *Understanding Blood Pressure Readings*, American Heart Association, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings.

by his medical conditions in his day-to-day activities. (Doc. 290–2, at 7). Thus, although his weight is significant, it is not particularly problematic. His moderate asthma and significant hypertension may also increase his risk to some degree. On balance, however, defendant is at only a marginally elevated risk of severe complications if exposed to COVID-19.

Notably, during his actual bout of COVID-19 in June 2020, defendant was asymptomatic, able to isolate, and had access to medical care. (*Id.*, at 1); (Doc. 291–1, at 1–2). "This Court and other courts have denied compassionate release when the defendant had only an asymptomatic or minor case of COVID-19 with no indication that the defendant's health will deteriorate in the future." *United States v. Sampson*, No. 8-CR-2026-CJW-MAR, 2020 WL 4207555, at *4 (N.D. Iowa July 22, 2020) (compiling cases). Thus, even if defendant had health conditions which substantially increased his risk during the pandemic, the fact that defendant contracted and recovered from COVID-19 without significant issue would weigh against a finding that extraordinary and compelling reasons exist for release.

Thus, the Court finds defendant has not presented an extraordinary and compelling reason for release and **denies** his motion for compassionate release on this basis. In the alternative, the Court will independently discuss the Section 3553(a) factors as if defendant had presented an extraordinary and compelling reason for release.

### 3. *Section 3553(a) Factors*

Defendant argues the Section 3553(a) factors favor release. (Doc. 290, at 19–24). Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for

12

Case 6:01-cr-02002-CJW-MAR    Document 294    Filed 01/25/21    Page 12 of 18

the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

Defendant's offense is not particularly aggravating. He was observed selling a small amount of cocaine near a school, but there is no indication he was targeting the school in any way. Months later, he was pulled over and found to be under the influence. A search of his car recovered two small baggies of cocaine. Defendant also had a small amount of cash comprised of smaller bills. The instant offense is his first and only drug-related offense. His sentence here was driven far more by his violent, recidivist criminal history. As a young man, defendant was out of control by any measure. His criminal record is replete with assaults, property damage, and a total disregard for the law and the safety of others.

That said, his upbringing helps explain his prior violent conduct. His father was incarcerated for sexually abusing his sisters. Despite his mother's efforts, his home was extremely dysfunctional, impoverished, abusive, unstable, and dangerous. Defendant was ultimately removed from his mother's care and placed in various foster homes. He was sexually abused on multiple occasions. Defendant's mental health examinations show his aggression arose out, in part, from various mental disorders such as depression and anxiety. One report also concluded defendant had brain damage which may be related to his conduct. At least one examination attributed his behavioral issues to his upbringing. Despite the instability in his life, he managed to earn the equivalent of a high school diploma as well as a training certification. Although defendant's prior term of incarceration of approximately five years did not wholly deter his criminal conduct, mental health records show his mood improved and his convictions following his release were less frequent and less violent. Defendant also maintained employment after being released.

13

Case 6:01-cr-02002-CJW-MAR   Document 294   Filed 01/25/21   Page 13 of 18

His violence and behavioral issues, however, continued for several years into his instant term of incarceration.  From 2004 to 2012, defendant was disciplined for fighting with another inmate, assault causing serious injury, possessing multiple gallons of bootleg alcohol three times, possessing a knife, exposing his penis to staff twice, verbally disrespecting an educator, assault by punching, refusing to obey an order, and burning a milk carton in his cell.  (Doc. 290–2, at 1–4).  In 2017, defendant was disciplined for refusing to obey an order.  (*Id.*, at 1).  In 2019, defendant was disciplined for possession of a hazardous tool.  (*Id.*).  Defendant has not had any disciplinary violations within the last year and only two minor violations in the past eight years.  (*Id.*, at 1–4).  Defendant formally completed his GED in 2001 and has since taken a handful of classes.  (*Id.*, at 5).  Since 2019, he has worked as a cook.  (*Id.*).

Today, defendant's violent criminal convictions are nearly 20 years behind him. His significant disciplinary violations are eight years behind him.  Defendant has been incarcerated for more than 19 years on a fairly minor, first-time drug offense and has approximately only a year and a half of his sentence remaining.  Notably, if he were sentenced today, he would not be considered a career offender because his prior offense would not qualify as a crime of violence under the now-deleted residual clause of USSG §4B1.2.  Defendant also has a stable release plan.  Defendant intends to reside with his wife.  (Doc. 290–2, at 9).  He apparently no longer desires a divorce as he did in 2001. In his pro se motion, he expressed his intent to pursue employment as a cook if released. (Doc. 284, at 3).

The record shows defendant's pattern of violence and criminal behavior has subsided.  The term of imprisonment he has already served has sufficiently reflected the seriousness of the offense, promoted respect for the law, and provided just punishment. Defendant's behavior over the past eight years shows he has been adequately deterred and is far less a danger to the community now than he was when he was a young man, if he presents any significant danger at all.  His remaining term of six years on supervised

14

release will provide further deterrence and a means of punishment should defendant return to criminal activity.

Thus, the Court finds, on balance, that the 3553(a) factors would warrant release. Because defendant has not identified an extraordinary and compelling reason, however, compassionate release is inappropriate. It is important to understand that the compassionate release provisions are not a license for judges to act as one-person parole boards, or for new judges to resentence offenders based on their views of appropriate sentences. Rather, the compassionate release provisions require first and foremost a showing of an extraordinary and compelling reason for compassionate release. Here, defendant has premised that motion on his health conditions in light of the COVID-19 pandemic and the Court has found he has failed to state a claim for that reason.

In light of these findings, defendant's motion for compassionate release is **denied**. The Court will next examine whether a reduction is appropriate under the FSA.

### IV. FIRST STEP ACT

#### A. *Applicable Law*

Congress enacted the FSA on December 21, 2018. The statute was part of a compressive criminal justice reform package and makes numerous changes to the criminal code, including reducing some mandatory minimum sentences, changing other sentencing ranges, and changing how compassionate release motions are filed. Section 404, the only portion of the FSA that is retroactive, provides that a court may "impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed." *Id*. § 404(b); *see also* 18 U.S.C. § 3582(c)(1)(B). The FSA defines a "covered offense" as any crime which had its penalties modified by Sections 2 or 3 of the Fair Sentencing Act of 2010. *Id*. § 404(a). Section 2 of the Fair Sentencing Act modified the statutory penalties for certain violations of Title 21, United States Code, Section 841(b) related to cocaine, effectively reducing the penalty applicable to a qualifying defendant. *See United States v. McDonald*, 944 F.3d 769, 771 (8th Cir. 2019). District courts have broad discretion in determining

15

whether to reduce a defendant's sentence on a covered offense under the FSA. *See, e.g.*, *United States v. Williams*, 943 F.3d 841, 844 (8th Cir. 2019).

### B. Analysis

The parties dispute whether defendant is eligible for a sentence reduction under the FSA and whether the Court should exercise its discretion to grant such a reduction. In light of the Court's 3553(a) analysis above, the Court would exercise its discretion to reduce defendant's sentence to time served if he is eligible under the FSA.

Defendant was convicted under Title 21, United States Code, Section 841(b)(1)(C). (Doc. 200, at 3). The Eighth Circuit has not addressed whether convictions under Section 841(b)(1)(C) are eligible for a sentence reduction under the FSA. Other circuits addressing this issue have reached differing conclusions. *Compare United States v. Woodson*, 962 F.3d 812, 817 (4th Cir. 2020) (eligible), *and United States v. Smith*, 954 F.3d 446, 450 (1st Cir. 2020) (eligible), *with United States v. Jones*, 962 F.3d 1290, 1305 (11th Cir. 2020) (ineligible).

In *United States v. Smith*, the First Circuit Court of Appeals held that "the phrase 'Federal criminal statute' in the [FSA]" referred to Section 841(a) generally and not the individual penalty provisions in Sections 841(b)(1)(A)–(C). 954 F.3d at 450. The court stated:

> The relevant statute . . . violated is either § 841 as a whole, or § 841(a), which describes all the conduct necessary to violate § 841. Section 841(b)(1), in turn, sets forth how the penalties for that conduct vary based on drug quantity. . . . The fact that the Constitution's procedural requirements mandate that the drug quantity be found by the jury to enhance the minimum penalty does not mean that a convicted defendant did not commit the violation identified by § 841.

*Id.*; *see also United States v. Dean*, No. 97-276 (3) (MJD), 2020 WL 2526476, at *3 (D. Minn. May 18, 2020) (following *Smith*). In the alternative, the *Smith* court found that Section 841(b)(1)(C) was also eligible for a reduction individually:

> The government argues that Smith was convicted under § 841(b)(1)(C) for distributing a small (or indeterminate) quantity of a controlled substance.

> Thus, in the government's view § 841(b)(1)(C) is the "Federal criminal statute" in question, and since the Fair Sentencing Act did not literally change the text of § 841(b)(1)(C), the statutory penalties for that subsection were not "modified." But § 841(b)(1)(C) applies to any "case of a controlled substance . . . except as provided in subparagraphs (A), (B), and (D)." 21 U.S.C. § 841(b)(1)(C). Since § 841(b)(1)(C) is defined in part by what § 841(b)(1)(A) and § 841(b)(1)(B) do not cover, a modification to the latter subsections also modifies the former by incorporation. In effect, § 841(b)(1)(C) set forth the penalties for quantities between zero and five grams of crack cocaine prior to the Fair Sentencing Act, and between zero and twenty-eight grams after. This is a modification. The fact that the prescribed sentencing range (zero to twenty years) under § 841(b)(1)(C) did not change is immaterial—the Fair Sentencing Act did not change the mandatory minimum or maximum for violations of § 841(b)(1)(A) or § 841(b)(1)(B), either, only the threshold quantities.

954 F.3d at 450; *see also Woodson*, 962 F.3d at 814 ("[W]e hold that when the Fair Sentencing Act changed the quantities of crack cocaine to which Subsection 841(b)(1)(C) applies, it 'modified' the statutory penalties of that subsection for purposes of crack cocaine offenders within the meaning of the [FSA].").

The government argues defendant is ineligible because the FSA did not reduce the statutory penalties for the specific quantity of drugs for which defendant was convicted. (Doc. 291, at 19). *See United States v. Banks*, 960 F.3d 982, 984 (8th Cir. 2020) ("Because the statute of conviction in Banks's case required only proof that he conspired to distribute 50 grams or more of cocaine base, and the Fair Sentencing Act reduced the penalties for a 50-gram conspiracy, he is eligible for a reduction."); *see also* § 404(c) ("No court shall entertain a motion made under this section to reduce a sentence if the sentence was previously imposed or previously reduced in accordance with the amendments made by sections 2 and 3 of the Fair Sentencing Act of 2010."). In other words, "[a]ny reduction the district court would grant would not be 'as if' the Fair Sentencing Act had been in effect. That is, the [FSA] does not permit a reduction when the Fair Sentencing Act could not have benefitted the movant." *Jones*, 962 F.3d at 1303.

17

Case 6:01-cr-02002-CJW-MAR   Document 294   Filed 01/25/21   Page 17 of 18

The Court finds that defendant is ineligible for a reduction under the FSA. Even if defendant's offense technically qualifies as a 'covered offense' because there were general modifications to the statute, the applicable penalties were not modified. Thus, even if the Court were to examine defendant's offense "as if sections 2 and 3 of the Fair Sentencing Act of 2020 were in effect," the result would not be changed. To hold otherwise would simply allow a court to resentence a defendant under the Section 3553(a) factors when some modification to their statute of conviction occurred, even if the modification would not actually have impacted the sentence. Thus, although the Court finds that a sentence reduction would be appropriate under Section 3553(a), the Court finds it lacks the authority to grant a reduction under the FSA. Holding otherwise would impermissibly broaden this Court's authority under the FSA.

## V. CONCLUSION

For these reasons, defendant's motion for compassionate release or relief under Section 404 of the FSA (Doc. 289) is **denied**.[11] Defendant must serve the remainder of his term of incarceration as previously directed. (Doc. 212).

**IT IS SO ORDERED** this 25th day of January, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

---

[11] In light of the above analysis, defendant's other motions for the same relief (Docs. 284 & 279) are **denied** for the same reasons.